FILED

2012 Aug-20  PM 01:58
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| ESTER GRAHAM, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case Number  2:11-CV-1416-SLB |
| | ) | |
| METHODIST HOME FOR THE AGING, d/b/a Fair Haven Retirement Center, | ) ) ) | |
| | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM OPINION</u>

This case is presently pending before the court on defendant's Motion for Summary Judgment.  (Doc. 17.)[1]  Plaintiff Ester Graham has sued her former employer, defendant Methodist Home for the Aging, alleging that defendant discriminated against her on the basis of her race, African-American, and that it retaliated against her for complaining about discrimination.  Upon consideration of the record, the submissions of the parties, the arguments of counsel, and the relevant law, the court is of the opinion that defendant's Motion for Summary Judgment, (doc. 17), is due to be granted.

## I. <u>SUMMARY JUDGMENT STANDARD</u>

Pursuant to Fed. R. Civ. P. 56(a), summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to

---

[1]Reference to a document number, ["Doc. ___"], refers to the number assigned to each document as it is filed in the court's record.

judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Clark v. Coats & Clark, Inc.*, 929 F.2d

604, 608 (11th Cir. 1991); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  Once

the moving party has met its burden, the non-moving party must go beyond the pleadings and

show that there is a genuine issue of fact for trial.  *See Celotex Corp. v. Catrett,* 477 U.S.

317, 324 (1986).   A dispute is genuine "if the evidence is such that a reasonable jury could

return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

248 (1986).

> A party asserting that a fact cannot be or is genuinely disputed must support
> the assertion by:
>
> (A)  citing to particular parts of materials in the record, including
> depositions, documents, electronically stored information, affidavits or
> declarations, stipulations (including those made for purposes of the
> motion only), admissions, interrogatory answers, or other materials; or
>
> (B)  showing that the materials cited do not establish the absence or
> presence of a genuine dispute, or that an adverse party cannot produce
> admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1); *see also Clark*, 929 F.2d at 608 ("it is never enough simply to state

that the non-moving party cannot meet its burden at trial").

In deciding a motion for summary judgment, the court's function is not to "weigh the

evidence and determine the truth of the matter but to determine whether there is a genuine

issue for trial."  *Anderson*, 477 U.S. at 249.  "[C]ourts are required to view the facts and draw

reasonable inferences 'in the light most favorable to the party opposing the [summary

judgment] motion.'"  *Scott v. Harris*, 550 U.S. 372, 378 (2007)(quoting *United States v.*

2

*Diebold, Inc.*, 369 U.S. 654, 655 (1962)(per curiam)).  Nevertheless, the non-moving party

"need not be given the benefit of every inference but only of every reasonable inference."

*Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999)(citing *Brown v.*

*City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988)); *see also Scott*, 550 U.S. at

380 ("When opposing parties tell two different stories, one of which is blatantly contradicted

by the record, so that no reasonable jury could believe it, a court should not adopt that

version of the facts for purposes of ruling on a motion for summary judgment.").

## II. <u>STATEMENT OF FACTS</u>

Defendant, Methodist Home for the Aging, owns four facilities, including Fair Haven,

that provide senior care and housing for the elderly.  (Doc. 19-5 ¶ 2.)  Trent Jackson has been

the Administrator and Executive Director of Fair Haven since March 8, 2010.  (Doc. 19-3

at 10.)[2]   From April 2009 until March 8, 2010, Mr. Jackson served as Assistant

Administrator, and he reported to then-Administrator Greg Dykes.  (Doc. 19-3 at 10-11.)

On November 14, 2007, Liz Prosch, then-Executive Director of Fair Haven, hired

plaintiff as Staff Development Coordinator,[3] and she was plaintiff's initial supervisor.  (Doc.

19-1 at 74; doc. 19-12 ¶ 1.)[4]  Ms. Prosch hired plaintiff to replace Sandy Watson, white, who

---

[2]Document 19-3 is Trent Jackson's deposition.  Citation to page numbers refers to the deposition page number and not the page number assigned to the document by the court's CM/ECF system.

[3]At some point, plaintiff's job title was changed to Education Director.

[4]Document 19-1 is plaintiff's deposition.  Citation to page numbers refers to the deposition page number and not the page number assigned to the document by the court's

remained in the Staff Development Office and reported to plaintiff.  (Doc. 19-1 at 78; doc. 19-12 ¶ 2; doc. 23-12 at 2.)  Plaintiff supervised Ms. Watson until Ms. Watson transferred in July 2008.  (Doc. 19-1 at 78.)  As Staff Development Coordinator, plaintiff set up the staff development program, performed mandatory in-service training, and conducted orientation for all the new employees.  (Doc. 19-1 at 74-76.)  Plaintiff testified that her job included nursing duties.  (*Id*. at 121-22.)  Mr. Jackson testified that plaintiff seldom performed nursing duties; he recalled she had responded to one "code blue" call.  (Doc. 19-3 at 169.) According to plaintiff, the State Board of Nursing Standards require that she be supervised only by a licensed nurse because she educated nurses and performed nursing duties.  (Doc. 19-1 at 121.)

Plaintiff testified that Ms. Prosch and Mr. Jackson harassed her by stating that the Staff Development Department would be moved to Human Resources and she would be supervised by Cathy Braden, white, Human Resources Manager at Fair Haven.  (Doc. 19-1 at 118; doc. 19-12 ¶ 10.)  Plaintiff testified that Ms. Prosch "constantly" said she was going to assign Ms. Braden to be plaintiff's supervisor.  (Doc. 19-1 at 116-17, 118.)  According to plaintiff, Ms. Braden did not have a nursing license.  (*Id*. at 117.)

Ms. Prosch testified:

When I was Executive Director, I planned to incorporate the Staff Development Coordinator job into the Human Resources Department with the staff developer being responsible for orientation for all employees on Fair

_____

CM/ECF system.

4

Haven policies and procedures and annual in-service training for all
employees.  Therefore, I believed that the Staff Development Office and the
Human Resources [Department] would work well together.  Further, I am a
registered nurse and it does not violate Alabama Standards of Nursing Practice
for a registered nurse providing orientation and in-service training to report to
somebody who is not a registered nurse.  A nurse who is providing direct care
to patients is required to report to a registered nurse; however, Cathy Braden,
as Human Resources Manager for Fair Haven, would not have been
supervising [plaintiff] in any direct care that she provided to patients.
However, I spoke with Ms. Graham about her reporting to Human Resources,
and she was not receptive.  Therefore, I did not push the topic.

(Doc. 19-12 ¶ 10.)  Plaintiff was never supervised by Ms. Braden; she was always supervised

by another nurse.  (Doc. 19-1 at 82-85, 118.)

On December 20, 2007, a new employee complained to plaintiff that Ms. Watson was

singling her out during orientation.  (19-12 ¶ 3.)  Plaintiff reported this complaint to Ms.

Prosch and Brenda White, African-American, Director of Nursing, and told them that she

believed Ms. Watson's conduct was racially motivated.  (Doc. 19-1 at 93-94; doc. 19-12 ¶

3.)  Specifically, plaintiff told Ms. Prosch and Ms. White that African-American employees

in Ms. Watson's class had complained about Ms. Watson being racist and treating new white

employees more favorably than new African-American employees, that Ms. Watson had told

other employees that plaintiff did not know what she was doing, that Ms. Watson did not

complete her assignments, that Ms. Watson followed the directives of white supervisors but

not plaintiff, and that Ms. Watson spoke over plaintiff and not white speakers.  (Doc. 19-1

at 93-95, 99.)   Ms. Prosch investigated plaintiff's complaints and found no evidence to

support the complaints.  (Doc. 19-12 ¶ 3.)  Despite finding no evidence to support plaintiff's

complaints, Ms. Prosch, Ms. Braden, and plaintiff counseled Ms. Watson about her behavior and the impact it was having on new employees. (Doc. 19-12 ¶ 3; doc. 19-13.) Plaintiff did not complain about Ms. Watson after the December 2007 incident. (Doc. 19-12 ¶ 4.) Ms. Watson transferred out of the Staff Development Department in July 2008, and, after July of 2008, plaintiff did not supervise another employee and worked alone in the Staff Development Department. (Doc. 19-1 at 78-79.)

Plaintiff testified that, sometime before October 2009, Phil Simendinger, white Director of Engineering at Fair Haven, conducted a mandatory in-service-training program on disasters. (*Id*. at 31.) During a discussion of terrorism, Mr. Simendinger twice referred to ***Osama*** bin Laden as ***Obama*** bin Laden. (*Id*.) Plaintiff reported the incident to Ms. White, who was her supervisor at the time, and Ms. White reported the incident to Mr. Dykes. (*Id*. at 32; doc. 19-3 at 106-08.) Mr. Dykes asked Mr. Jackson to speak to Mr. Simendinger about the incident, which he did on October 6, 2009. (Doc. 19-3 at 107-08; doc. 19-5 ¶ 23.) Mr. Simendinger told Mr. Jackson that he had made a "slip of the tongue," and he apologized.[5] (Doc. 19-5 ¶ 23.) According to Mr. Jackson, Mr. Simendinger was not disciplined because he had not engaged in any intentional conduct; however, the incident was documented and placed in Mr. Simendinger's personnel file. (Doc. 19-5 ¶ 23; doc. 19-10.)

---

[5]In his memo regarding this meeting, Mr. Jackson noted that Mr. Simendinger said he had voted for President Obama. (Doc. 19-10.)

Plaintiff also claims that, after leaving Fair Haven, she learned of other racist comments or remarks by Mr. Simendinger. (Doc. 19-1 at 27-28.) Isha Worsham, African-American, gave plaintiff a written statement describing an incident that occurred sometime in 2010, which she described as follows:

> I was sitting in a sitting room at Fair Haven with other co-workers watching TV waiting until the nurses made out our work assignment. [Mr. Simendinger] . . . came in while we waited and made the statement[, "Y']all look like monkeys sitting around". "It must be nice to get a pay check and do nothing". We were surprised because we were black and knew that the word "monkey" was a racial term used to describe[ ] blacks.

(Doc. 19-4 at 39.) Ms. Worsham's statement was written on December 23, 2010, after plaintiff resigned. (*Id*.)

Plaintiff also testified that another African-American employee, Debra Renfro, had told her that Mr. Simendinger had referred to African-American employees as monkeys on another occasion. (Doc. 19-1 at 28-30.) Plaintiff testified that this alleged comment was made *before* she started to work at Fair Haven. (*Id*. at 30.) Mr. Jackson testified that he was unaware of these comments until sometime after plaintiff had filed her Complaint. (Doc. 19-3 at 109-12; doc. 19-5 ¶ 30.)

Barbara Alexander, African-American, reported to plaintiff that Mr. Simendinger had made a presentation and had administered a test during an orientation meeting, and, during the meeting, he approached the African-American employees and said, "I know you all didn't make a[n] A because you all never make A[']s." (Doc. 19-1 at 38.) Ms. Alexander told plaintiff that she "felt very intimidated," and she asked plaintiff, "[W]hy do y'all have him

teaching, he doesn't know how to relate to blacks, he make[s] us feel like we are inferior."

(*Id*.)  Plaintiff did not report Ms. Alexander's complaint.  (*Id*.)

Mr. Simendinger never supervised plaintiff and had no involvement in any decisions

regarding her employment with Fair Haven.  (Doc. 19-5 ¶ 21; doc. 19-1 at 41.)

Mr. Jackson observed plaintiff conduct educational seminars and orientation on

numerous occasions, and he found her to be "untimely," and "[u]norganized, ill-prepared,

and often not . . . the best first impression for new employees."  (Doc. 19-3 at 69, 70.)  While

Mr. Jackson did not discipline plaintiff for her performance, (*id*. at 106), he testified:

> I shared with Ms. White that I didn't feel that our orientation program was
> what it needed to be; that the room was not clean and organized; that the
> classroom did not look like a classroom; that plaintiff did not look organized;
> that . . . [the] classroom didn't look like a classroom; . . . that we didn't look
> organized, we didn't look clean, didn't look neat; that we lacked hospitality
> skills; that we should have hot coffee and cold drinks with ice and
> refreshments; and that we ought to meet the employees in the front lobby.

(*Id*. at 89).  Mr. Jackson talked to plaintiff directly about her orientation schedule.  (Doc. 19-1

at 126; doc. 19-3 at 77-80.)  Plaintiff contends she scheduled orientation on a weekly basis,

but Mr. Jackson thought orientation should be every other week.  (Doc. 19-1 at 126.)

Plaintiff did not agree that orientation should be every other week but finally agreed to his

schedule; however, plaintiff claims that she eventually had to go back to doing orientation

every week because of the amount of turnover.  (Doc. 19-1 at 126-27.)

Mr. Jackson testified:

> I felt it did not leave a very good impression to employees that we were
> hiring to come onboard with us and their first impression was:  I don't know

where to go, I don't know what to do, there's nobody here to greet me.  And then as those of us who attempted to help them along their way, it – you know we might offer to, in an effort to help [plaintiff], walk an orientee up – you know to get on the elevator, walk around to the second floor, and present that person to the  – to the classroom.

And, again, the door would be locked or the lights would be off or [plaintiff] had gone to make copies or gone to get something that wasn't there . . . .

. . .

And I didn't feel like . . . we welcomed or greeted our employees on their first day in a manner that we should.

(Doc. 19-3 at 80-81.)  Plaintiff testified that Mr. Jackson often told her that she was leaving the new employees unattended when they arrived for orientation.  (Doc. 19-1 at 134-35.)

Plaintiff testified that when Ms. Prosch was her supervisor she had told plaintiff that she would get equipment to help her with training, such as an overhead projector, a copier, a laptop computer, and some mannequins, which she did not get.  (*Id*. at 111-13.)  Ms. Prosch was plaintiff's supervisor until January 2009.  (Doc. 19-12 at 1.)  Plaintiff was able to borrow equipment from Herzing College, and Mr. Simendinger found her a mannequin.  (Doc. 19-1 at 114.)  Also, plaintiff had a computer and was able to use copier in another office.  (*Id*. at 114-15.)  Plaintiff claims that Brian Watson, white Head of Life Enrichment, had an overhead projector.  (*Id*. at 112; doc. 19-5 ¶ 31.)  She also testified that Mr. Watson also got a printer and anything else he needed to perform his job duties.  (Doc. 19-1 at 113.)  She also contends that Mr. Jackson told her to use more "innovative things" – such as graphs and

9

PowerPoint presentations – but she "didn't have them because [she] didn't have a budget and [she] couldn't purchase them." (Doc. 19-1 at 152.)

On March 8, 2010, after becoming the Administrator for Fair Haven, Mr. Jackson held his first staff meeting. (Doc. 19-3 at 98-99; doc. 19-1 at 142.) In this meeting, Mr. Jackson told the Fair Haven employees that he had no plans to make any changes during the next sixty days and that he was going to spend that time getting to know the employees. (Doc. 19-3 at 99.) He also told the employees that he was going to start having one-on-one meetings once a week with the Department Heads who supervised employees. (Doc. 19-1 at 142-43; doc. 19-5 ¶ 8.) He testified he did not plan to meet with plaintiff because she did not supervise anyone. (Doc. 19-5 ¶ 8.)

After the meeting ended, plaintiff approached Mr. Jackson in the hall and asked him why he had not included her in the weekly meetings with Department Heads. (Doc. 19-1 at 143-44.) Mr. Jackson told her that he was not going to meet with other Department Heads, like the Chaplain. (Doc. 19-1 at 144; doc. 19-5 ¶¶ 8-9.) Plaintiff testified, "I told him that I had a very key position as far as being able to know what's going on so that I could share this information with the staff and teach as needed." (Doc. 19-1 at 144.) Mr. Jackson told plaintiff she did not need to be there. (Doc. 19-1 at 145; doc. 19-5 ¶ 9.) During this conversation, plaintiff told Mr. Jackson that she was not going to report to Ms. Braden because Ms. Braden was not a nurse and did not have the qualifications to supervise her. (Doc. 19-1 at 145-46; doc. 19-3 at 116.)

10

Plaintiff testified that she was "very calm" during this conversation, (*see* doc. 19-1 at 145); however, Mr. Jackson testified that "the tone of her voice raised and her anxiety level raised and she was shaking," (doc. 19-3 at 122). Plaintiff has submitted a statement from Sharon Johnson, East Unit Manager, in which Johnson stated, "I . . . did not hear [plaintiff's] 'outburst' or [hear her] become loud following a stand[-]up meeting [on March 8, 2010]." (Doc. 19-4 at 40, doc. 23-12.) Nevertheless, plaintiff approached Mr. Jackson later in the day and apologized. (Doc. 19-1 at 147; doc. 19-3 at 122-24.)

Mr. Jackson documented the incident, noting that plaintiff's behavior was not professional. (Doc. 19-3 at 123-24; doc. 19-4 at 59.) Plaintiff denied ever receiving the document prepared by Mr. Jackson. (Doc. 19-1 at 147.) Also, she testified that she was not disciplined as a result of the incident and that her pay was not decreased. (*Id*. at 148.)

Each morning since becoming Administrator, Mr. Jackson holds a stand-up meeting, which is a short meeting, during which he meets with "Department Heads and other key employees to identify any problems they are having and to communicate information to the entire leadership team." (Doc. 19-3 at 126; doc. 19-5 ¶¶ 10-11.) He calls on certain employees and then, before the meeting ends, he asks if anyone else has something to add. (Doc. 19-3 at 126-28; doc. 19-5 ¶ 11.) Plaintiff testified that Mr. Jackson "purposefully would omit [her] every time and [she] would have to raise [her] hand to share pertinent information with the group and with Mr. Jackson." (Doc. 19-1 at 149.) Mr. Jackson always allowed her to speak. (*Id*. at 15.)

Plaintiff testified that white employees were allowed to come and go as they pleased; although plaintiff never received any discipline for her attendance, her absence was reported to Ms. White on a number of occasions. (*Id.* at 177, 178 182; doc. 19-2 at 51.) She testified that Norma Earnest, white Director of Life Enrichment, was late for a stand-up meeting and told her, "I just can't make these stand-up meetings on time." (Doc. 19-1 at 177.) However, Mr. Jackson never asked where Ms. Earnest was. (*Id.* at 178.) Plaintiff was never disciplined for attendance. (*Id.* at 182.)

Ms. White resigned in late April 2010. (Doc. 19-5 ¶ 12.) Mr. Jackson decided he needed to replace her with an employee that had prior experience as Director of Nursing who could step into the job without the need for training. (*Id.*) Mr. Jackson discussed the replacement with Ms. White and she recommended three white nurses. (*Id.* ¶¶ 12-13.) One of those nurses, Kathy Wilson, was selected to replace Ms. White on a temporary basis until a permanent replacement was selected. (Doc. 19-1 at 84; doc. 19-5 ¶ 14.)

On Thursday, May 20, 2010, Ms. Prosch had a conversation with Simona Cannon, African-American West Unit Manager, in which Ms. Cannon indicated that she was interested in becoming an educator after she earned her Bachelor of Science Degree in Nursing. (Doc. 19-12 ¶ 5; doc. 23-12 at 1.) Ms. Prosch asked Ms. Cannon if she might be interested in assisting her with some upcoming in-service programs related to Fair Haven's "new culture-change journey." (Doc. 19-12 ¶ 6.) The same day, May 20, 2010, plaintiff submitted an employment application at Hanover Health and Rehabilitation. (Doc. 19-15.)

Plaintiff testified that on May 21, 2010, Ms. Cannon told plaintiff that Ms. Prosch had

offered her plaintiff's job.  (Doc. 19-1 at 153-154, 165-66.)

On Saturday, May 22, 2010, plaintiff emailed  a memo entitled "Violation of Ethics

& Professionalism" to Mr. Jackson, Ms. Prosch, Mike Giles, Chief Operating Officer for

defendant and Mr. Jackson's supervisor, and Christopher Tomlin, Chief Executive Officer.

(Doc. 19-1 at 152-53, 157-58; doc. 19-2 at 38; doc. 19-3 at 11; doc. 19-12 ¶ 7; doc. 19-14.)

The email stated:

> I was informed yesterday, Friday, May [21, 2010,] that my position as Ed. Dir.
> was offered to another nurse without anyone informing me that my position as
> Ed. Dir. was no longer in effect.  Here to date I have not received a written or
> verbal warning that my performance was in anyway substandard.  Needless to
> say, this has caused me great mental anguish, humiliation and disappointment.
> Moreover, my character as a reliable, competent, and professional nurse is at
> risk due to your thoughtless and unfounded decision to replace me in such an
> undermining manner.
>
> My work speaks for [itself].  I entered this work assignment facing significant
> challenges.    Staff Development was without structure.    Much of the
> educational activities and staff development elements were developed and
> implemented by me.  Fair Haven has [benefitted] from my God[-]given talents,
> experiences and dedication.  What is your reasoning behind this?  Is it because
> I speak out against injustices that I encounter?  God forbid, I will never cease
> to speak out against any act that I witness that is unfair or unjust.  This is my
> right and I stand firm to exercise it.
>
> The nurse sharing this information with me was outraged at the thought that
> you could do such a thing and under estimate her professionalism and integrity.
>
> I demand a response.  After all, I perceive that my job here as the Dir. of Ed.
> is in immediate jeopardy.

(Doc. 19-2 at 38.)

After receiving the email, Ms. Prosch emailed Mr. Giles, Mr. Tomlin, and Mr. Jackson that she had not offered plaintiff's job to Ms. Cannon and that plaintiff was mistaken. (Doc. 19-12 ¶ 7; doc. 19-14.)  Ms. Prosch wrote:

> Fact:
> In a casual chat with Simona on Thursday during the lunch break, she mentioned that she was going back to school.  She eventually wanted to teach.  In response I asked her if she would be interested in helping me teach some in[-]services in support of the strategic plan if i prepared the objectives, content, Powerpoints and handouts.  She said she would love to do that.  I told her I could really benefit from the help and would discuss it with [Mr. Jackson] and the [Director of Nursing] to see if they would be willing to cover her unit on occasion to allow her to conduct some in[-]services.  . . .  The offer was intended to give her an opportunity to use her skills and passion for teaching.  At no time did we discuss the director of staff development position or even mention the position or Ester.  And, I did not even come close to offering her a job.  Ester is misinformed.
>
> Don't hesitate to call me if you need be to explain.  I apologize that this one innocent gesture to encourage, value and engage Simona created such a disturbance.

(Doc. 19-14.)

Mr. Jackson also spoke with Mr. Giles and Mr. Tomlin about the allegations.  (Doc. 19-3 at 139.)  Then, he spoke about the allegations with Vicki Jackson, defendant's Director of Human Resources, (doc. 19-11 ¶ 1), and she indicated that they needed to meet with plaintiff, which they did for about an hour and a half on Monday, May 24, 2010, (doc. 19-3 at 57-58).  During the meeting, Mr. Jackson explained to plaintiff that Ms. Prosch did not have the authority to make any decisions regarding her employment and that he had spoken to Ms. Prosch and she had denied offering plaintiff's job to anyone.  (Doc. 19-5 ¶ 17; doc.

14

19-3 at 59; doc. 19-1 at 161-62.)  Mr. Jackson also told plaintiff that they had no plans to

remove her from her job.  (Doc. 19-3 at 59-61; doc. 19-5 ¶ 17.)  Despite Mr. Jackson's

assurances, plaintiff told him that "she believed it was true [that Ms. Prosch had offered Ms.

Cannon plaintiff's job], and that . . . if she believed it, then it was true."  (Doc. 19-3 at 61.)

Plaintiff testified that Mr. Jackson told her that her allegations were very serious and

that he had investigated the matter.  (Doc. 19-1 at 159.)  Also, she testified that Mr. Jackson

had asked her who had told her she was being replaced, but plaintiff did not tell him.  (*Id*.)

Plaintiff testified that she spoke with Ms. Cannon again, after meeting with Mr. Jackson, and

that Ms. Cannon insisted that Prosch had offered her plaintiff's position.  (*Id*. at 165-66.)

On May 24, 2010, the same day as her meeting with Mr. Jackson and Ms. Jackson,

plaintiff filed a Charge of Discrimination, Charge No.  420-2010-02011, alleging race

discrimination.  (Doc. 19-1 at 173; doc. 19-2 at 49-53.)  In this Charge, plaintiff contended:

> I am an African[-]American female.  I am employed by the above referenced
> employer.  I was hired on November 14, 2007, in the position of Staff
> Development Coordinator.  I was later placed in the position of Director of
> Education in 2008.  Since 2007, I have been subjected to racial discrimination.
> I complained to a corporate representative, Elizabeth Prosch, but she did not
> provide any feedback.  Since February 15, 2010, I have been subjected to
> racial harassment by Administrator, Trent Jackson, and Ms. Prosch.  Mr.
> Jackson complained to my former supervisor, Brenda White, regarding my job
> performance on several occasions.  Ms. White informed me that I was
> performing my duties satisfactor[ily] and to continue to do so.  Mr. Jackson
> intentionally fails to ask for my input at schedule[d] meetings which is crucial
> to the needs of the department.

(Doc. 19-2 at 49.)  On the attached questionnaire, plaintiff wrote, "I have been repeatedly

reported to my immediate [supervisor] for having new hires wait for me[,] alleging that I am

15

late . . . ," and, "A co-worker, another nurse, informed me that my job was offered to her." (Doc. 19-2 at 51.)  She also noted, "I noticed that my white co-workers came [and] went as they willed, were included in department meetings [and] informed when I wasn't."  (*Id*.)

Plaintiff did not tell Mr. Jackson, Ms. Braden, Ms. Jackson, Mr. Giles, or any other member of management at Fair Haven that she had filed a Charge of Discrimination.  (Doc. 19-1 at 173-74.)  Mr. Jackson testified that he had no knowledge that plaintiff had filed the May 24, 2010, Charge of Discrimination until sometime after she resigned. (Doc. 19-3 at 32, 188; doc. 19-5 ¶ 20.)

After meeting with Mr. Jackson and Ms. Jackson, plaintiff spoke with Ms. Prosch, who apologized and said she had not offered plaintiff's job to Ms. Cannon.  (Doc. 19-1 at 164-65.) Plaintiff told Ms. Prosch she would have to pray about it.  (*Id*. at 165.)

Ms. Jackson called plaintiff a couple of days later and requested another meeting with plaintiff and Mr. Jackson.  (*Id*. at 162.)  Plaintiff asked to have a witness of her choosing at the meeting; Ms. Jackson told plaintiff that Mr. Giles denied her request for a neutral witness. (*Id*. at 163-64.)  Ms. Jackson told plaintiff that she was the neutral witness to the meeting between Mr. Jackson and plaintiff.  (*Id*.)  Plaintiff refused to meet with Mr. Jackson and Ms. Jackson.  (*Id*. at 164.)

Mr. Jackson called plaintiff again and indicated that they really needed to get together and discuss the situation, but plaintiff refused to meet with him without a witness.  (*Id*. at 169-70.)  After plaintiff refused to tell Mr. Jackson the name of the nurse who she alleged

16

was offered her job, and after she refused to meet with Mr. Jackson and Ms. Jackson without

a witness of her choosing, Mr. Jackson prepared an Employee Counseling Report/Final

Warning and left it in plaintiff's intra-office mail box on May 27, 2010.  (Doc. 19-3 at 142;

doc. 19-1 at 170.)  The Employee Counseling Report/Final Warning, states:

> Nature of Incident
>
> On May 22, 2010, at 3:35 PM, you charged a fellow [registered nurse] and co-employee, Ms. Liz Prosch, MHA Director of Organizational Development, with unethical and unprofessional behavior.  . . .  Such behavior, if true, is inconsistent with Methodist Homes Corporation's policies and possibly with the Alabama Nurse Practice[s] Act.  According to you, the foundation for this charge was a conversation you had with another nurse on Friday[,] May 21, 2010, in which this nurse allegedly told you that the position you currently hold as Education Director had been offered to another nurse.  You have refused to identify the nurse who you say told you that your job was in jeopardy.  When I tried to explain to you that your job had not been offered to anyone and that no one had discussed such a change, you told me that you had no reason to doubt the word of the unnamed nurse reporting this incident to you.
>
> . . .
>
> I, Trent Jackson (NHA)[,] and Vicki Jackson (HR-Director) have investigated the allegation as best we can without your cooperation.  Our investigation did not identify any nurse who talked with you about you being removed from your current job as Education Director.  In fact, our investigation revealed only one discussion that occurred during the time frame of Thursday, May 20 to Friday[,] May 21, 2010[,] that in any way related to another nurse, who is not currently in an education role, taking on a new educational responsibility.  This discussion took place between Liz Prosch, RN[,] and Simona Cannon, RN[,] Thursday, May 20, 2010.  During this discussion, Ms. Prosch learned of Ms. Cannon's interest in becoming an educator after she earns her Bachelor Degree in Nursing and asked Ms. Cannon if she might be interested in helping Ms. Prosch with some upcoming in-service programs related to our culture-change journey.  Ms. Cannon acknowledged having this discussion with Ms. Prosch, but denies she was ever offered your job and she denied that she ever

17

discussed her conversation with Ms. Prosch with you.  Moreover, Ms. Prosch admits having the above-described conversation with Ms. Cannon and also denies offering Ms. Cannon the job of Education Director.  In fact, Ms. Prosch does not have any operational authority at Fair Haven Retirement Center and does not have the authority to make any decision about your employment.

On Monday, May 24, 2010, Ms. Jackson and I met with you for more than an hour and thirty minutes to discuss our findings.  You again refused to provide us with any information that would help us understand your charge against Ms. Prosch.  Moreover, when I told you that we could not find any evidence that supported your charge, you told me that you stood by your charge and would not change anything you had told me.  When I asked you why you would make such a charge even though the evidence clearly shows that you have reached your conclusions based upon inaccurate, unfounded information, you told me that whatever you chose to believe was "your truth" and that you knew "that your [G]od was in control."

On Wednesday, May 26, 2010, Liz Prosch met with you in an effort to explain to you what had occurred during her discussion with Ms. Cannon on May 20, 2010, and to apologize for any misunderstanding that had resulted from her effort to help Ms. Cannon grow professionally.  Your response to Ms. Prosch was that you would have to "pray about it."  However, even after this effort by Ms. Prosch to explain what occurred, you still refuse to withdraw your groundless accusation against Ms. Prosch.

(Doc. 19-4 at 60-61.)  In the section for Supervisor's Remarks, Mr. Jackson noted:

Your behavior on May [22], 2010, in which you made unfounded allegations of unethical and unprofessional behavior against a fellow nurse and co-employee is the second incident since March 2010 in which you have behaved unprofessionally and in a manner inconsistent with Methodist Homes' Mission, Vision and Values.  . . .

  . . .

Like your unprofessional behavior on March 8, 2010, your angry outburst and unfounded allegations against Ms. Prosch on May 22, 2010, were based upon your unfounded beliefs which were based upon something you "heard" from someone else.  Your behavior on May 22, 2010, was unprofessional and detrimental to the operation of Fair Haven Retirement Community.  You have

18

apparently decided to ignore my counsel to you that your conduct must be
consistent with the Methodist Homes' Mission, Vision and Values.  You are
hereby warned that any further unprofessional behavior by you, or any further
violation of Methodist Homes' behavioral expectations, as described in the
Methodist Homes Employee Handbook, may result in your termination without
any further progressive discipline.

(*Id*. at 60, 62.)

After receiving the Final Warning, plaintiff spoke with three other African-American

employees – Ms. Cannon, Sharon Johnson, and Cheryl Redwine – and they discussed how

they could not "take" working at Fair Haven anymore.  (Doc. 19-1 at 196-97; doc. 23-12 at

1.)  On May 31, 2010, plaintiff and the three other employees resigned their employment with

defendant.  (*Id*. at 191, 196-97.)  Plaintiff testified that she was "forced" to resign because

of the Final Warning.  (*Id*. at 190.)  She testified, "[The] Final [W]arning meant that that was

it.  Mr. Jackson could have construed anything to be inappropriate that I did and I would have

been terminated and I could not risk that.  . . .  I had no other choice but to resign."  (*Id*. at

190-91.)

Plaintiff gave a month's notice, but Ms. Wilson, Director of Nursing, told her that she

did not have to work out the notice.  (*Id*. at 192.)  Defendant paid plaintiff for the month.  (*Id*.

at 193.)  According to plaintiff, Ms. Braden escorted her off the premises as if she had been

terminated or had stolen something.  (*Id*. at 193-94.)  Mr. Jackson testified that the resigning

employees were escorted out of the building because they were not conducting themselves

in a manner that was consistent with the behavior of most healthcare professionals.  (Doc.

19-3 at 157.)  He said that there was "[l]oud talking in the hallway [and] yelling from one

19

floor down to the lower floor; swift movements; getting things and getting carts to get things; telling other employees: [']I'm leaving, I'm out of here, I'm gone.[']" (*Id*.) Mr. Jackson did not communicate with the resigned employees on May 31, 2010, and he admitted avoiding them. (*Id*. at 162.) He testified that he avoided them because they were upset and angry and "the atmosphere that day didn't lend itself to too many questions." (*Id*. at 156, 157.)

Plaintiff has submitted a statement from Ms. White, the former Director of Nursing, in which Ms. White contends that Mr. Jackson told her that "he knew how to make people resign and they would never know it happened." (Doc. 19-4 at 42.) Ms. White states that she "was skeptical of this talent until [she] saw him use it on another employee." (*Id*.) Mr. Jackson denies telling Ms. White that he knew how to make people resign. (Doc. 19-3 at 104.)

White employees Cathy Gagliano, Director of Social Services, and Audrey Hammonds, Dietary Manager, resigned but were not escorted from the building. (Doc. 19-1 at 199-200.) Mr. Jackson testified that he did not believe their continued employment would cause a disruption; and they did not resign in concert with other employees. (Doc. 19-5 ¶¶ 26-27.)

Plaintiff started working with Hanover Health and Rehabilitation on June 2, 2010, two days after she resigned. (Doc. 19-1 at 197; doc. 19-2 at 81.) The job paid $2.74 per hour less than her job at Fair Haven, and she was required to pay more than twice as much for health

insurance.  (Doc. 19-1 at 202-04.)  Ms. Cannon, Ms. Johnson, and Ms. Redwine also went

to work at Hanover. (*Id*. at 198.)

After plaintiff resigned, Malea Braxton, white, and Marylyn Caudle, white, filled in

to provide orientation for the new employees until January 2011, when Regina Bagley,

African-American, was hired as Staff Development Coordinator.  (Doc. 19-3 at 41-47.)

Plaintiff filed a second Charge of Discrimination, Charge No. 420-2010-02888, on

September 15, 2010, alleging race discrimination and retaliation occurring on May 31, 2010.

(Doc. 19-1 at 204; doc. 19-2 at 58, 59.)  In this Charge, plaintiff repeated the allegations of

her first Charge and added:

> On May 24, 2010, I filed a charge of discrimination against the employer
> ([Charge No.] 420-2010-02011).  On May 31, 2010, I was forced to resign my
> employment as a result of the continued racial harassment imposed on me.  I
> was escorted by Cathy Barden [sic], Human Resources Director, until I exited
> the building.  White employees who have resigned were not treated in this
> manner.

(Doc. 19-2 at 58.)  The record does not contain a Dismissal and Notice of Rights for this

Charge.

## III.  <u>DISCUSSION</u>

## A.  RACE DISCRIMINATION

Plaintiff alleges defendant discriminated against her on the basis of her race by taking

the following adverse employment actions:  (1) issuing plaintiff a Final Warning on May 27,

2010, (2) failing to provide plaintiff with certain equipment, (3) failing to include plaintiff

in one-on-one meetings and failing to call on plaintiff during stand-up meetings, and (4)

21

constructively discharging plaintiff. (Doc. 23 at 16-17, 20, 25, 29-30.)  Because plaintiff

relies upon circumstantial evidence to prove her claims, the court's analysis is governed by

the tripartite framework established by the Supreme Court in *McDonnell Douglas Corp. v.*

*Green*, 411 U.S. 792 (1973), and later refined in *Texas Department of Community Affairs v.*

*Burdine*, 450 U.S. 248 (1981).  *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S.

133, 142 (2000).  The Supreme Court has explained this framework as follows:

> *McDonnell Douglas* and subsequent decisions have established an allocation of the burden of production and an order for the presentation of proof in . . . discriminatory-treatment cases.  First, the plaintiff must establish a prima facie case of discrimination.  . . .  The burden [then] shift[s] to [the defendant] to produce evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason.  This burden is one of production, not persuasion; it can involve no credibility assessment.  [When the defendant offers] admissible evidence sufficient for the trier of fact to conclude that [the plaintiff suffered an adverse employment action for a legitimate, nondiscriminatory reason], the *McDonnell Douglas* framework--with its presumptions and burdens – disappear[s], and the sole remaining issue [is] discrimination vel non . . . .

> Although intermediate evidentiary burdens shift back and forth under this framework, the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.  And in attempting to satisfy this burden, the plaintiff – once the employer produces sufficient evidence to support a nondiscriminatory explanation for its decision – must be afforded the opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.  That is, the plaintiff may attempt to establish that he was the victim of intentional discrimination by showing that the employer's proffered explanation is unworthy of credence.

*Id. at* 142-43 (internal citations and quotations omitted).

Generally, "plaintiff establishes a prima facie case of disparate treatment by showing that she was a qualified member of a protected class and was subjected to an adverse employment action in contrast with similarly situated employees outside the protected class." *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1087 (11th Cir. 2004)(citations omitted). Defendant contends that plaintiff cannot establish a prima facie case of discrimination because she cannot establish that she was subjected to an adverse employment action.

An adverse employment action is an essential element of a claim of discrimination. *Davis v. Town of Lake Park*, 245 F.3d 1232, 1238 (11th Cir. 2001). "[T]o prove [an] adverse employment action . . . an employee must show a serious and material change in the terms, conditions, or privileges of employment." *Id*. at 1239, *quoted in Howard v. Walgreen Co.*, 605 F.3d 1239, 1245 (11th Cir. 2010). "[T]he employee's subjective view of the significance and adversity of the employer's action is not controlling; the employment action must be materially adverse as viewed by a reasonable person in the circumstances." *Davis*, 245 F.3d at 1239, *quoted in Howard*, 605 F.3d at 1245. Therefore, plaintiff must "establish an 'ultimate employment decision' or make some other showing of substantiality in the employment context in order to establish an adverse employment action." *Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008)(citing, *inter alia*, *Davis*, 245 F.3d at 1239).

An "ultimate employment decision" is one "such as termination, failure to hire, or demotion." *Id*. For a decision "falling short of an ultimate employment decision" to rise to the level of an actionable adverse employment, that decision "must, in some substantial way,

alter the employee's compensation, terms, conditions, or privileges of employment, deprive him or her of employment opportunities, or adversely affect his or her status as an employee." *Id*. (internal quotations and citation)).   Among the facts and circumstances affecting whether a decision is considered "adverse" are whether the decision results in "lesser pay, responsibilities or prestige," and whether the decision would "impede an employee's professional growth or advancement." *Doe v. DeKalb County School District*, 145 F.3d 1441, 1452 (11th Cir. 1998).  "Although proof of direct economic consequences is not required in all cases, the asserted impact 'cannot be speculative and must at least have a tangible adverse effect on the plaintiff's employment.'" *Soloski v. Adams*, 600 F. Supp. 2d 1276, 1356 (N.D. Ga. 2009) (quoting *Filius v. Potter*, 176 Fed. Appx. 8, 10 (11th Cir. 2006))(unpublished).[6]   "While adverse employment actions extend beyond readily quantifiable losses, not everything that makes an employee unhappy is an actionable adverse action.   Otherwise, minor and even trivial employment actions that 'an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit.'" *Smart v. Ball State University*, 89 F.3d 437, 441 (7th Cir. 1996)(quoting *Williams v. Bristol-Myers Squibb Co.*, 85 F.3d 270, 274 (7th Cir. 1996)), *quoted in Davis*, 245 F.3d at 1242).

---

[6]"Unpublished opinions [of the Eleventh Circuit] are not considered binding precedent, but they may be cited as persuasive authority."  11th Cir. R. 36-2.

### 1. Final Warning

Trent Jackson issued plaintiff a written Final Warning on May 27, 2010.   Defendant

contends that this Final Warning was not an adverse employment action because it had no

effect on plaintiff's employment.   Plaintiff alleges:

> [T]he Final Warning was used as a tool against Plaintiff to further discriminate
> against Plaintiff and to work towards constructively discharging Plaintiff from
> her position with Defendant. (Graham Depo. Def. Ex. 13 & 15).  Defendant
> . . . argued that Plaintiff cannot prove a prima facie case of discrimination with
> regard to the May 27, 2010, Final Warning.  (Doc. 18 p. 23).  Defendant
> continues by stating that Plaintiff was not suspended, had no loss of pay, and
> there is no evidence that the Final Warning had any impact on any other term,
> condition, or privilege of her employment.  It shall be an unlawful employment
> practice for an employer to limit, segregate, or classify his employment in any
> way which would deprive or tend to deprive any individual because of his race,
> color, religion, sex, or national origin, or to classify or refer for employment
> any individual on the basis of his race, color, religion, sex, or national origin.
> *42 U.S.C. § 2000e section 703(a)*.  The Final Warning used to discipline
> Plaintiff clearly impacted Plaintiff's employment with Defendant.   This
> warning severely limited Plaintiff's opportunities with Defendant as this
> severely hindered Plaintiff's opportunities for promotions and pay increases.
> The Defendant limited Plaintiff on the basis of her race.

(Doc. 23 at 20-22.)

In her Response, plaintiff quotes "42 U.S.C. § 2000e section 703(a)," and argues that

the "Final Warning" had "limited" her "employment opportunities" by "severely hinder[ing]

Plaintiff's opportunities for promotions and pay increases."  (Doc. 22 at 41.)  Section 2000e-

2(a)(2) of Title VII provides:

> It shall be an unlawful employment practice for an employer –
>
> . . .

> (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e-2(a)(2).  "Regardless of the route a plaintiff follows in proving a Title VII action, the existence of some adverse employment action is required." *James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 375 (4th Cir. 2004)(internal citation and footnote omitted). Section 2000e-2(a)(2) does not "simply prohibit[ ] actions that "limit, segregate, or classify" persons; rather the language prohibits such actions that 'deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's' race . . . .  Thus the text focuses on the effects of the action on the employee rather than the motivation for the action of the employer."  *Smith v. City of Jackson*, 544 U.S. 228, 235-36 (internal citations omitted).

The undisputed facts show that plaintiff received the Final Warning on May 27, 2010 – four days before she resigned – and the Final Warning was unaccompanied by a reduction in pay, suspension, demotion, or termination.  Although plaintiff contends that the Final Warning "severely hindered [her] opportunities for promotions and pay increases," (doc. 23 at 22), the undisputed evidence shows that she was not denied a promotion or a pay increase in the few days she worked after receiving the Final Warning.  Plaintiff can only speculate that defendant might have considered the "Final Warning" as grounds for denying her a promotion or a pay increase at some time in the future.  "Although [Title VII and Section

1981 do] not require proof of direct economic consequences in all cases, the asserted impact [of the employment decision] cannot be speculative and must at least have a tangible adverse effect on the plaintiff's employment." *Davis*, 245 F.3d at 1239.

Under the circumstances, the Final Warning, which did not affect the terms, conditions, or privileges of employment, is not an actionable adverse employment action. *See Clark v. Potter*, 232 Fed. Appx. 895, 897 (11th Cir. 2007)(letter of warning that had no effect on the plaintiff's employment was not an adverse employment action)(unpublished); *Austin v. City of Montgomery*, 196 Fed. Appx. 747, 753 (11th Cir. 2006)(counseling memos not adverse employment actions; plaintiff failed to show that memos were "a formal reprimand or triggered any tangible form of adverse action such as loss in benefits, ineligibility for promotional opportunities, or more formal discipline")(unpublished); *Summerlin v. M&H Valve Co.*, 167 Fed. Appx. 93, 97 (11th Cir. 2006)(a reprimand that does not "have an impact on an important condition of employment, such as salary, title, position, or job duties," is not an adverse employment action)(unpublished); *Braswell v. Allen*, 586 F. Supp. 2d 1297, 1306 (M.D. Ala. 2008)("A reprimand does not constitute an adverse employment action when the employee suffers no tangible harm as a result.")(citations omitted)

Based on the foregoing, defendant's Motion for Summary Judgment will be granted and Plaintiff race discrimination claim based on the Final Warning will be dismissed.

## 2. Equipment

Plaintiff contends that her supervisor, Ms. Prosch, told her that she would get equipment to help with training; however, she never received the equipment. (Doc. 23 at 25-26.) Plaintiff contends that she requested such equipment and that the "[d]enial or non-acknowledgment of [her] requests for equipment by Fair Haven was an adverse employment action." (*Id*. at 26.)

In support of her claim that failure to provide her with requested equipment and/or failure to acknowledge her request for such equipment constituted an adverse employment action, plaintiff cites an unpublished case from the Middle District of Alabama in which the employee "contend[ed] he was subjected to disparate treatment by his employer by not providing him a 'radio.'" (*Id*. at 25-26 [citing *Head v. Pitts Enterprises, Inc.*, Civil Action No. 1:09cv187-WHA, 2010 WL 2773376, *14 (M.D. Ala. July 14, 2010)].) The *Head* case provides no support for plaintiff's position.

In that case, the court held:

> [Plaintiff] Washington claims that Pitts subjected him to disparate treatment by not providing him a radio which supervisors are provided for communication throughout the plant. ***The court cannot conclude that the denial of a radio is an adverse employment action.*** Washington has submitted no evidence showing why the denial of a radio is a "serious and material change in the terms, conditions, or privileges of employment." *Davis*, 245 F.3d at 1239. Accordingly, to the extent Washington states a claim based on the provision of a radio, Pitts'[s] Motion for Summary Judgment is due to be GRANTED.

*Head*, 2010 WL 2773376 at *14 (emphasis added); *see also Baker v. World Technical Services, Inc.*, No. 8:09–cv–2450–T–30AEP, 2011 WL 1466164, 5 (M.D. Fla. Apr. 18, 2011)(Failure to provide plaintiff a radio was insufficient to establish an adverse employment action); *Nash v. Palm Beach County School Dist.*, No. 08-80970-CIV., 2010 WL 3220191, 9 (S.D. Fla. Aug. 13, 2010)(denial of a request for training equipment was not an adverse employment action); *see also Markel v. Bd. of Regents of Univ. of Wis. Sys.*, 276 F.3d 906, 911, 912 (7th Cir. 2002) (The denial of "'better' equipment" and "the ability to travel and make presentations" were "not readily quantifiable losses Title VII was meant to redress.").

"Title VII is not a vehicle to be used by employees to compel their employers to upgrade their technology or training."  *Cantrell v. Jay R. Smith Mfg. Co.*, 248 F. Supp. 2d 1126, 1138 (M.D. Ala. 2003).  "[W]hether [an employer] wishes to give its [employees] specific pieces of equipment is a business decision that is not susceptible to judicial oversight."  *Enowmbitang v. Seagate Technology, Inc.*, 148 F.3d 970, 973 (8th Cir. 1998). Plaintiff did not testify that she was unable to successfully complete her job duties without the desired equipment or that the denial had any adverse effect on the terms, conditions, or privileges of her employment.  Therefore, the court finds the failure to provide this equipment or to acknowledge her request for new equipment were not serious and material changes in the terms and conditions of plaintiff's employment.  *See Galloway v. GA Technology Authority*, 182 Fed. Appx. 877, 879-880 (11th Cir. 2006)(unpublished); *see also Baker v. City of Safe Harbor*, 2008 WL 4200147, 12 -13  (M.D. Fla. 2008)(district court

found that providing plaintiff with "a shovel in poor condition" was not an adverse employment action "because the plaintiff himself testified that he successfully completed his assignment with the allegedly inferior shovel by merely bending the shovel tip back with a hammer").

Based on the foregoing, defendant's Motion for Summary Judgment will be granted and Plaintiff's race discrimination claim based on defendant's denial of her request for equipment will be dismissed.

### 3. Meetings

Plaintiff contends that she was discriminated against when she was not asked to attend a one-on-one weekly meeting with Mr. Jackson.  She also contends that she was discriminated against because Mr. Jackson did not ask her to report the status of her department at the stand-up meetings, as he did other Department Heads, and she had to raise her hand to speak.

Plaintiff's exclusion from one-on-one meetings with Mr. Jackson, without evidence of some substantial adverse effect on the terms and conditions of her employment, is not an adverse employment action.  *See Akins v. Fulton County*, 420 F.3d 1293, 1302 (11th Cir. 2005)("exclusion from meetings" not an adverse employment action); *Galloway*, 182 Fed. Appx. at 879-880 (being excluded from meeting was not an adverse employment action; plaintiff did not show evidence of a tangible effect on plaintiff's employment or argue that the alleged adverse employment action was "sufficiently material and serious to alter the

terms and conditions of his employment"); *see also Head*, 2010 WL 2773376 at *14 (plaintiff failed to prove a prima facie case of discrimination "because he . . . failed to show that not being invited to the production meetings constitute[d] adverse employment actions;" plaintiff "submitted no evidence showing why not being included in attendance at these production meetings was a serious and material change in the terms, conditions, or privileges of employment")(internal quotations and citation omitted).

The evidence shows that Mr. Jackson had his first staff meeting as Administrator on March 8, 2010.  During this meeting he said he was going to have one-on-one meetings with some Department Heads, but he did not include plaintiff.  He told plaintiff he did not need to meet with her on a weekly basis; he testified he only met with Department Heads who supervised other employees.  Plaintiff asserted that she was important enough to warrant a weekly meeting; however, she has not presented evidence of any serious and material change in the terms, conditions, or privileges of her employment caused by her failure to meet with Mr. Jackson.  Plaintiff's hurt feelings at being excluded from one-on-one meetings do not constitute an adverse employment action; her "subjective view of the significance and adversity of the employer's action is not controlling." *Davis*, 245 F.3d at 1239.  "Simply put, [plaintiff's] loss of prestige or self-esteem [caused by being excluded from one-on-one meetings with Mr. Jackson] – without more – [does not] establish the adverse action necessary to pursue a claim under Title VII's anti-discrimination clause." *Id*. at 1242; *see also Smart*, 89 F.3d at 441 ("While adverse employment actions extend beyond readily

31

quantifiable losses, not everything that makes an employee unhappy is an actionable adverse action.").

The court finds that Mr. Jackson's failure to meet one-on-one with plaintiff on a weekly basis is not an actionable adverse employment action.

Likewise, plaintiff's subjective belief that Mr. Jackson should have called on her during the stand-up meetings does not support a finding that this was an adverse employment action. Plaintiff has not demonstrated that Mr. Jackson's decision not to call on her had any effect on her employment. If plaintiff had something to contribute, she raised her hand and Mr. Jackson allowed her to speak. The court finds no adverse effect on plaintiff's employment as a result of this procedure.

Based on the foregoing, defendant's Motion for Summary Judgment will be granted and plaintiff's discrimination claim based on the meetings will be dismissed.

### 4. Constructive Discharge

Plaintiff contends, "A reasonable juror could conclude that the working conditions suffered by [her] were so severe as to force her to resign." (Doc. 23 at 16.) As facts supporting her claim, she contends:

> [Plaintiff], together with other employees of Defendant, was subjected to inappropriate and derogatory racial comments on numerous occasions. On one occasion, Mr. Phil [Simendinger] then Director of Maintenance, while presenting a mandatory class for all employees on disaster procedures made repeated reference to the President as "Obama bin Laden." This was a direct affront to the black employees present. On another occasion, Mr. [Simendinger] stated to a group of black employees waiting for their work assignment that they looked like "monkeys" sitting around and added that it

must be nice to get paid for doing nothing.   During another educational offering, Mr. [Simendinger] stood in front of the black dietary and maintenance staff in the back of the room and asked them a question which they could not answer.  He then made a derogatory statement directed to them something like, "you can't open your mouth now."  In yet another meeting, during which Mr. [Simendinger] presented materials and followed up by administering a test on the materials, he came up to the black staff and said, "I know you all didn't make a[n] A because you all never make A's."

These are several examples of racial slurs made in front of [plaintiff] and/or other staff members that fueled the culture of racism and created intolerable working conditions for [plaintiff]. [She] reported the incident involving the "bin Laden" comment to her supervisor who later informed [her] that it was a "slip of the tongue."  Mr. Jackson, Defendant's Administrator, was aware of the "monkeys" comment but did not recall speaking to Mr. [Simendinger] about the comment.  No disciplinary action was taken against [Mr. Simendinger].

. . .

. . .  The several examples of racial slurs encountered by [plaintiff] . . . are actual events of racial harassment which created intolerable working conditions under which a reasonable person in plaintiff's position would have felt compelled to resign.

(Doc. 23 at 16-18.)

Apparently, plaintiff argues her constructive discharge claim "stems from, and can be regarded as an aggravated case of, [racial] harassment or hostile work environment."  *See Pennsylvania State Police v. Suders*,  542 U.S. 129, 146 (2004).  In *Suders*, the Supreme Court noted:

For an atmosphere of [racial] harassment or hostility to be actionable, . . . the offending behavior "must be sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Meritor* [*Savings Bank, FSB v. Vinson*], 477 U.S. [57], 67, 106 S. Ct. 2399 [(1986)](internal quotation marks and brackets omitted).  A

33

hostile-environment constructive discharge claim entails something more: A plaintiff who advances such a compound claim must show working conditions so intolerable that a reasonable person would have felt compelled to resign. *See*, *e.g.*, *Breeding v. Arthur J. Gallagher & Co.*, 164 F.3d 1151, 1160 ([8th Cir.] 1999) ("[A]lthough there may be evidence from which a jury could find sexual harassment, . . . the facts alleged [for constructive discharge must be] . . . so intolerable that a reasonable person would be forced to quit."); *Perry v. Harris Chernin, Inc.*, 126 F.3d 1010, 1015 ([7th Cir.] 1997) ("[U]nless conditions are beyond 'ordinary' discrimination, a complaining employee is expected to remain on the job while seeking redress.").

[Plaintiff's] claim is of the same genre as the hostile work environment claims the Court analyzed in *Ellerth*[7] and *Faragher*.[8] Essentially, [plaintiff] presents a "worse case" harassment scenario, harassment ratcheted up to the breaking point. Like the harassment considered in our pathmarking decisions, harassment so intolerable as to cause a resignation may be effected through co-worker conduct, unofficial supervisory conduct, or official company acts. Unlike an actual termination, which is always effected through an official act of the company, a constructive discharge need not be. A constructive discharge involves both an employee's decision to leave and precipitating conduct: The former involves no official action; the latter, like a harassment claim without any constructive discharge assertion, may or may not involve official action.

*Id*. at 146-48 (footnotes added).

Plaintiff testified that she learned of Mr. Simendinger's "monkeys" comment only after she had resigned. (Doc. 19-1 at 27-28.) Therefore, this racial epithet had no effect on plaintiff's work environment at Fair Haven. *See Edwards v. Wallace Community College*, 49 F.3d 1517, 1522 (11th Cir.1995).

It is true, of course, that a hostile work environment claim may rest on words and conduct that the plaintiff did not observe and that were not directed at him.

[7]*Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998).

[8]*Faragher v. Boca Raton*, 524 U.S. 775 (1998).

34

*See Reeves*, 594 F.3d at 811 ("words and conduct that are sufficiently [race]-specific and either severe or pervasive may state a claim of a hostile work environment, even if the words are not directed specifically at the plaintiff"); *Edwards v. Wallace Community College*, 49 F.3d 1517, 1522 (11th Cir.1995)(Title VII "plaintiff may have a viable hostile work environment claim even if the racial remarks were not directed at her"). ***But the law in this Circuit is clear that a hostile work environment claim can be predicated only on conduct, statements and incidents of which the plaintiff was actually aware during his employment.*** *See, e.g., Edwards*, 49 F.3d at 1522 ("some of the incidents relied upon were not made known to Edwards until after her termination and, therefore, could not have contributed to her subjective view of a hostile environment"); *Melton v. National Dairy LLC*, 705 F. Supp. 2d 1303, 1341 (M.D. Ala. 2010)( "A plaintiff may also support a claim of hostile work environment by the use of harassing conduct he learned of through hearsay, so long as he was aware of the harassing incidents at the relevant time")(citations omitted and emphasis added); *Carpenter v. Kelley Foods of Alabama, Inc.*, 2005 WL 3277094, *3 n.4 (M.D. Ala. Dec. 2, 2005)(plaintiffs could not rely on incidents occurring after their termination to support claim that they subjectively perceived work environment as racially hostile); *Gonzalez v. Florida Dep't of Highway Safety and Motor Vehicles Div. of Fla. Highway Patrol*, 237 F. Supp. 2d 1338, 1350 (S.D. Fla. 2002)(granting defendant's summary judgment motion on hostile work environment claim where plaintiff "has not always made it clear how and when he learned of" the purportedly discriminatory statements).

*Woods v. Austal, U.S.A., LLC*, 2011 WL 1380054, *19 n.60 (S.D. Ala. 2011)(emphasis added).  Therefore, the court has not considered Mr. Simendinger's "monkeys" statement as contributing to plaintiff's alleged hostile work environment because plaintiff was unaware of the statement until after she resigned.

The alleged harassing conduct of which plaintiff was aware at the time she resigned includes the Final Warning, Mr. Simendinger's "bin Laden" statements and his two statements to black employees in seminars; Ms. Prosch's mention that the Education Department should be part of the Human Resources Department and Ms. Braden should be

plaintiff's supervisor, and Mr. Jackson's refusal to meet with plaintiff once a week and to call on plaintiff in stand-up meetings unless she raised her hand. Considering these incidents the court finds no reasonable jury could find that the alleged discriminatory harassment was sufficiently severe or pervasive to alter plaintiff's working conditions. *See McCann v. Tillman*, 526 F.3d 1370, 1379 (11th Cir. 2008). Because plaintiff has not demonstrated that she can prove a hostile work environment, "[s]he cannot . . . meet the higher standard for constructive discharge." *Barrow v. Georgia Pacific Corp.*, 144 Fed. Appx. 54, 59 (11th Cir. 2005)(unpublished). Therefore, her constructive discharge claim is due to be dismissed.

Even if the court were to assume plaintiff's work environment was hostile because of racial harassment, defendant would still be entitled to summary judgment on plaintiff's constructive discharge claim because plaintiff did not testify that she resigned because of alleged harassment. She testified that she was "forced to [resign]" after receiving the Final Warning because the "Final [W]arning meant that that was it. Mr. Jackson could have construed anything to be inappropriate that I did and I would have been terminated and I could not risk that. . . . I had no other choice but to resign." (Doc. 19-1 at 190-91.) In other words, plaintiff resigned because she did not want to stay and risk being terminated; she did not resign because her working conditions were intolerable due to racial harassment.

The Eleventh Circuit has held that an employee's decision to resign in the face of **possible** termination is not a constructive discharge. *Rowell v. BellSouth Corp.*, 433 F.3d 794, 806 (11th Cir. 2005); *Hargray v. City of Hallandale*, 57 F.3d 1560, 1568 (11th Cir.

1995).  A plaintiff cannot, as a matter of law, contend that she was discharged unless she can demonstrate that she had no objectively reasonable opportunity to remain employed.  Indeed, "the ***possibility*** that a plaintiff may not remain employed is not by itself enough to place a reasonable person in the position of 'quit or be fired.'"  *Rowell*, 433 F.3d at 806 (emphasis added.)  "Resignations obtained in cases where an employee is faced with such unpleasant alternatives are nevertheless voluntary because the fact remains that plaintiff ***had a choice***.  Plaintiff could stand pat and fight."  *Hargray*, 57 F.3d at 1568 (quoting *Christie v. United States*, 518 F.2d 584, 587, 207 Ct. Cl. 333 (1975))(internal quotations omitted; emphasis in *Hargray*).

According to plaintiff, she was forced to resign after receiving the Final Warning because she could not risk being fired.  The record does not contain any evidence of real coercion by defendant.  Plaintiff may have felt under attack and vulnerable, but no reasonable person would have felt ***compelled*** to resign in light of the Final Warning.  Indeed, in this case, plaintiff received the Final Warning only after she refused to accept the fact that defendant was ***not*** terminating her and giving her position to Ms. Cannon.  Such circumstances, as a matter of law, do not support a finding that plaintiff had no opportunity to remain employed.  Therefore, she has not shown that she was compelled to resign.

Based on the foregoing, defendant's Motion for Summary Judgment will be granted and plaintiff's race-discrimination claim based on constructive discharge will be dismissed.

## B. RETALIATION

In order to establish a prima facie case of retaliation in violation of Title VII and Section 1981, plaintiff must establish: (1) a statutorily protected expression; (2) an adverse employment action; and (3) a causal relationship between the protected expression and the adverse action. *Davis v. Coca-Cola Bottling Co. Consol.*, 516 F.3d 955, 978 n.52 (11th Cir. 2008).

To show an adverse employment action, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)(internal quotations and citations omitted).  The Supreme Court used the term "material adversity because [it stated that it] believe[d] it [was] important to separate significant from trivial harms." *Id*. at 68.  This standard differs from the standard for establishing an adverse employment action in a race discrimination claim. *Id*. at 67 ("[W]e conclude that Title VII's substantive provision and its antiretaliation provision are not coterminous.  The scope of the antiretaliation provision extends beyond workplace-related or employment-related retaliatory acts and harm.  We therefore reject the standards applied in the Courts of Appeals that have treated the antiretaliation provision as forbidding the same conduct prohibited by the antidiscrimination provision and that have limited actionable retaliation to so-called "ultimate employment decisions.").

"The causal link element [of the retaliation prima facie case] is construed broadly so that a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated." *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001)(quoting *Olmsted v. Taco Bell Corp.*, 141 F.3d 1457, 1460 (11th Cir.1998)(quoting *E.E.O.C. v. Reichhold Chem., Inc.*, 988 F.2d 1564, 1571-72 (11th Cir.1993)))(internal quotations omitted).  Plaintiff must prove, "that the decision-makers were aware of the protected conduct, and that the protected activity and the adverse action were not wholly unrelated." *McCann*, 526 F.3d at 1376 (internal quotations and citations omitted). "The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close.'" *Clark County School Dist. v. Breeden*,  532 U.S. 268, 273-74 (2001)(quoting *O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1253 (10th Cir. 2001)).

Plaintiff contends that she engaged in three acts of protected activity:  (1) she complained about Ms. Watson in December 2007; (2) she complained about Simendinger's reference to Osama bin Laden as Obama bin Laden in October 2009; and (3) she filed an EEOC charge on May 24, 2007.  (Doc. 23 at 32, 33, 34.)  As a result of these protected activities, plaintiff alleges that her responsibility for supervising another employee was removed in July 2008, she was disciplined on May 27, 2010, for complaining about Ms. Prosch replacing her; and she was constructively discharged on May 31, 2010.  (Doc. 36-37.)

Plaintiff contends that the casual connection between her protected activity and the claimed adverse actions is established by a close temporal proximity between the two. Specifically, she contends that, after she complained about Ms. Watson, in December 2007, she was stripped of her supervisory role in July 2008.  (Doc. 23 at 38.)  This temporal proximity of over six months is too long to support a causal connection.  *See Brown v. Alabama Dept. of Transp.*, 597 F.3d 1160, 1182 (11th Cir. 2010)(citing and quoting *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2008)).  "Even a three-month interval between the protected expression and the employment action . . . is too long. Thus, in the absence of other evidence tending to show causation, if there is a substantial delay between the protected expression and the adverse action, the complaint of retaliation fails as a matter of law."  *Id*.  Plaintiff has presented no other evidence of causation between her complaint about Ms. Watson and removing her supervisory authority.  Therefore, plaintiff's retaliation claim based on her complaint about Ms. Watson will be dismissed.

Plaintiff's complaint about Mr. Simendinger's bin Laden comments occurred sometime before October 6, 2009.  Her Brief in Response to Defendant's Motion for Summary Judgment is less than clear about what retaliatory adverse employment action was caused by this protected activity.  She appears to argue that she was subjected to "intolerable" harassment, consisting of "inappropriate and derogatory racial comments on multiple

occasions" by Mr. Simendinger,[9] which led to her constructive discharge. (*See* doc. 23 at 34-36.) In her Brief in Response to Defendant's Motion for Summary Judgment, plaintiff argues that her complaint about Mr. Simendinger's bin Laden comments was protected activity, and immediately thereafter, she begins to discuss constructive discharge.[10]  (*Id*.)

She alleges that Mr. Simendinger referred to her and her coworkers as a monkeys and that he said "that it must be nice to get paid for doing nothing."  (Doc. 23 at 35 ["Mr. Simendinger stated that Plaintiff and other similarly situated employees looked like "monkeys" and stated that it must be nice to get paid for doing nothing."].)  Plaintiff did not testify that Mr. Simendinger ever said that she looked like a monkey.  Moreover, although she testified that Mr. Simendinger had referred to other African-American employees as looking like monkeys and getting paid for not working, she was unaware of this fact until after she resigned.  Therefore, for the reasons set forth above, the court has not considered

---

[9]Plaintiff testified that she never heard anyone but Mr. Simedinger make a racial comment.  (Doc. 19-1 at 41-42.)

[10]She argued:

Defendant has stipulated that Plaintiff's complaint about Mr. Simendinger's reference to President Obama as "Obama Bin Laden" would also be a protected activity.  (Doc. 18, p. 30).  Plaintiff agrees that this was a protected activity.  Since there is no objection by either party, there is no need to dwell on the issue as to whether or not this constituted a protected activity.

Defendant states that Plaintiff is unable to show a constructive discharge.  (Doc. 18 p. 30).

(Doc. 23 at 34.)

Mr. Simendinger's "monkeys" statement as contributing to plaintiff's alleged hostile work environment based on retaliatory harassment.

The only other "inappropriate and derogatory racial comments" plaintiff alleges Mr. Simendinger made are (1) the bin Laden comments, (2) "you can't open your mouth now," allegedly said to "black dietary and maintenance staff" after Mr. Simendinger "asked them a question which they could not answer," and (3) "I know you all didn't make a[n] A because you all never make A's," allegedly said to "black staff" after Mr. Simendinger gave them a test. (Doc. 23 at 17.)  Clearly the bin Laden comments preceded plaintiff's complaint about the bin Laden comments and, therefore, they could not have been caused by plaintiff's complaint about the comments.  The court finds, as a matter of law, that plaintiff has not presented substantial evidence from which a reasonable jury could find that Mr. Simendinger's comments "might well have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *See Burlington Northern*, 548 U.S. at 68.

Finally, plaintiff contends her EEOC Charge, filed on May 24, 2010, is protected activity, and the court agrees.  She plaintiff does not dispute the fact that defendant was unaware of her EEOC charge until some time after she had resigned.  Nevertheless, she fails to recognize the significance of this fact on the issue of establishing a causal connection between the EEOC Charge and the adverse employment action.  Plaintiff argues:

> ***Plaintiff does not dispute the fact that neither Mr. Jackson nor Fair Haven was aware of Plaintiff's Charge of Discrimination until after her employment was separated from Defendant***. (Graham Depo. pp. 173, 174). However, Defendant has failed to address the retaliatory conduct leading just

42

prior to Plaintiff's constructive discharge from Defendant.  Plaintiff received notice that Ms. Prosch offered Plaintiff's job to Ms. Simona Cannon.  (Graham Depo. p. 153).  After Plaintiff received news that Plaintiff was being pushed out of her position in favor of Ms. Cannon, Plaintiff contacted Mr. Jackson, Ms. Prosch, Mike Giles, and CEO Christopher Tomlin through email regarding this incident.  (Graham Depo. p. 158).  This email was submitted to the aforementioned individuals on or about May 22, 2010.  (Graham Depo. pp. 157, 158, Def. Ex. 12, Bates stamp 47).  On or about May 27, 2010, Plaintiff was disciplined with a Final Warning, which impeded any opportunities for promotion or raises.  This went on to further the hostile and discriminatory work environment that caused the constructive discharge of Plaintiff on or about May 31, 2010. ***These incidents were certainly the result of Plaintiff's involvement in protected activity***.  Furthermore, there is a close temporal proximity between this awareness and the adverse employment action.  It has been held that an adverse employment action meets the proximity test if it occurs within over a month of the protected activity.  *Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322 (11th Cir. 1999).

(Doc. 23 at 38-39 [emphasis added].)

Plaintiff's EEOC Charge cannot be the cause of any adverse employment decision made by defendant because defendant did not know she had filed the charge.  Activity about which defendant knows nothing cannot motivate it to take any action.  "At a minimum, a plaintiff must generally establish that the employer was actually aware of the protected expression at the time it took the adverse employment action."  *Brown v. Metropolitan Atlanta Rapid Transit Authority*, 261 Fed. Appx. 167, 175 (11th Cir. 2008)(quoting *Clover v. Total System Services, Inc.*, 176 F.3d 1346, 1354 (11th Cir. 1999); citing *Raney v. Vinson Guard Serv.*, 120 F.3d 1192, 1197 (11th Cir. 1997)).  And while [the Eleventh Circuit has] held that awareness of protected expression may be established based on circumstantial evidence, [its] cases have required plaintiffs to show a defendant's awareness with more

evidence than mere curious timing coupled with speculative theories." *Raney*, 120 F.3d at 1197.  Plaintiff has presented no evidence that defendant was aware of her EEOC Charge when Mr. Jackson issued the Final Warning.  Therefore, to the extent plaintiff asserts that her EEOC charge ***caused*** Mr. Jackson to issue the Final Warning or to constructively discharge her, such claim is frivolous and will be dismissed.

However, the court notes that plaintiff may be arguing that the protected activity is the email sent to Mr. Jackson and Ms. Prosch on May 22, 2010, in which she asserts that Ms. Prosch gave her job to another employee because plaintiff had spoken out about "injustices."[11]

In her email to Mr. Jackson and Ms. Prosch, plaintiff complains that her job was given to another nurse without telling her and without cause.  (Doc. 19-2 at 38.)  Then she asks whether the reason for her displacement was "because [she] speak[s] out against ***injustices*** that [she] encounter[s]."  (*Id.* [emphasis added].)   She does not mention "race," discrimination," or "retaliation," (*id*.), "which is what Title VII requires." *Sitar v. Indiana Dept. of Transp.*, 344 F.3d 720, 727 (7th Cir. 2003).  Also, plaintiff has not directed the court to any testimony or other evidence indicating that she complained to Mr. Jackson or Ms. Jackson that she believed she was replaced because she had complained about race

---

[11]Plaintiff testified, "I felt like I was retaliated against after I made the complaint regarding Ms. Prosch and Mr. Jackson.  That final warning was directly related to that." (Doc. 19-1 at 206.)  However, she does not clearly identify this email as protected activity. (*See* doc. 23 at 38-39.)

discrimination or in retaliation for prior complaints of unlawful discrimination or that she

explained that the "injustices" referred to in her email were instances of unlawful

discrimination or retaliation.

> Although an employee need not use the magic words ["race discrimination"]
> or ["retaliation"] to bring her speech within Title VII's retaliation protections,
> "she has to at least say something to indicate her [race or retaliation] is an
> issue. An employee can honestly believe she is the object of discrimination [or
> retaliation], but if she never mentions it, a claim of retaliation is not
> implicated, for an employer cannot retaliate when it is unaware of any
> complaints." *Miller* [*v. American Family Mut. Ins. Co.*], 203 F.3d [997,] 1008
> [(7th Cir. 2000)]. *Cf. Dey v. Colt Const. & Dev. Co.*, 28 F.3d 1446, 1458 (7th
> Cir.1994).

(*Id.*) The court finds that the email is too ambiguous about whether the "injustices" of which

plaintiff speaks are employment practices that are unlawful under Title VII and § 1981.

Therefore, the court finds that the email is not protected activity. *See Brown v. City of

Opelika*, 211 Fed. Appx. 862, 864 (11th Cir. 2006); *Shah v. Clark Atlanta University, Inc.*,

No. CIV.A.1:97–CV3786CAM, 1999 WL 1042979, *14 (N.D. Ga. July 20, 1999)("While

a complaint about retaliation for a protected activity would itself be a protected activity,

plaintiff's complaint that he was being retaliated against because of his actions in the fall

semester does not qualify as a protected activity.  Also, a general complaint that his teaching

assignments were unfair would obviously not be protected activity.")

Plaintiff's claim, if indeed she has asserted one, based on her email as protected

activity is due to be dismissed.

Even if the court assumed that plaintiff's email contained a complaint that her job had been given to another nurse because plaintiff had spoken out against unlawful discrimination or retaliation, defendant's Motion for Summary would still be granted because the court finds plaintiff has not offered evidence sufficient for a reasonable jury to find that she had a good faith belief that her job had been given to another employee.

In an unpublished opinion, the Eleventh Circuit held:

> Under the "opposition clause," Title VII prohibits an employer from retaliating against an individual because the individual "opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e-3(a). To establish a Title VII retaliation claim under the opposition clause, a plaintiff must show, among other things, that he engaged in statutorily protected expression. *See Weeks v. Harden Mfg. Corp.*, 291 F.3d 1307, 1311 (11th Cir. 2002). And to satisfy the "statutorily protected expression" requirement, a "plaintiff must show that [he] had a good faith, reasonable belief that the employer was engaged in unlawful employment practices." *Id.* (quotations and citations omitted).
>
> We have explained that a plaintiff must demonstrate both a subjective belief that his employer engaged in unlawful employment practices, and that such belief was objectively reasonable. *See id.* at 1312. "It thus is not enough for a plaintiff to allege that his belief in this regard was honest and bona fide; the allegations and record must also indicate that the belief, though perhaps mistaken, was objectively reasonable." *Id.* The reasonableness of the employee's belief is measured against existing substantive law. *See Clover v. Total System Services, Inc.*, 176 F.3d 1346, 1351 (11th Cir.1999). No actual unlawfulness is required but the opposed conduct "must be close enough [to unlawful] to support an objectively reasonable belief that it is." *Id.*

*Van Portfliet v. H & R Block Mortg. Corp.*, 290 Fed. Appx. 301, 303 (11th Cir. 2008)(unpublished).

The court finds plaintiff's steadfast insistence that she had been replaced, despite the evidence and assurances to the contrary, was not reasonable.  Ms. Prosch was no longer plaintiff's supervisor and she did not have authority to replace or terminate plaintiff.  In the email, plaintiff listed a number of reasons why she finds the alleged action to be "thoughtless and unfounded" – including that she had not received any warning that her job performance was substandard and her work speaks for itself.  (Doc. 19-2 at 38.)  However, despite these facts, plaintiff insisted that she had been replaced simply upon the word of a co-worker, who was not qualified for her position.  Under the circumstances, the court finds plaintiff has not demonstrated that her complaint that Ms. Cannon was offered her job in retaliation for her complaints about injustices was based on an objectively reasonable belief that defendant had engaged in an employment practice made unlawful by Title VII and/or § 1981.

Based on the foregoing, the court finds that defendant's Motion for Summary Judgment is due to be granted and plaintiff's claims of retaliation will be dismissed.

## CONCLUSION

For the foregoing reasons, the court is of the opinion that there are no material facts in dispute and defendant is entitled to judgment as a matter of law.  An Order granting defendant's Motion for Summary Judgment will be entered contemporaneously with this Memorandum Opinion.

**DONE**, this 20th day of August, 2012.


*Sharon Lovelace Blackburn*
SHARON  LOVELACE  BLACKBURN
CHIEF UNITED STATES DISTRICT JUDGE